Mr. Moore? Yes. Good morning. Good morning. May it please the Court, I'm R. Henry Moore. I represent Cumberland Coal Resources, LP, and I would ask to reserve three minutes for a time. This case involves three citations issued with respect to Cumberland's breeder system in January and February 2004. They break into two parts, actually. One issued on January 16th, and two issued in February. The reason they break into two parts is that the one on January 16th was based on an evaluation of the entire system, so to speak. The two in February were based on essentially single readings, and the number two entry in by the long wall phase on the tailgate side. Let me ask you a question, if I could, about the technology here. Am I correct in understanding that this was a long wall of unprecedented length for Cumberland? It was the longest long wall Cumberland had planned to mine. It was, I think, a thousand or two feet longer in terms of length. So I'm hearing that as a yes? Yes. Okay. Now, is there something and you're going to have to help me with the terminology. I'm assuming that you don't say GOB, you say gob, is that right? Yes, gob. Okay, the gob. Is there something about a gob of this size, that is, something that's going to be over 10,000 feet long, that would make it warrant measurement in a way different from a gob of a more usual length? Well, let me answer that question by going back to your first question, which is while this panel would ultimately be longer than any other panel at Cumberland, it had just started up at the end of December. So it had mined, I think, approximately a thousand feet during this period, if that much. But you also discovered problems as you were going? The long wall initially started up, there were certain issues that had to be addressed. The evidence is that when you start up a long wall, until your gob becomes established, you may have problems keeping air on the face. The methane shutdowns, so to speak, that occurred initially were more related to that than to the bleeder system as such. You knew this was an unusually gassy mine, right? That it was kicking off a lot of methane? Yes, it is a gassy mine. And does a wraparound bleeder system, is that usually used in a mine of this size? Up until ... This was the 49th panel. The first 35, I believe, were mined by a wraparound system. The last 14 were mined using a system where you had a bleeder fan in the back of the long wall, so to speak. The immigration judge seems to indicate, though, that for ... Those darn immigration judges are taking over everything. Now the ALJ seemed to indicate that this, for a long wall mine of this size, a wraparound system just was not something that had ever been tried before. Is that accurate? It had, for a panel this size at Cumberland, they had not used it before. But I don't think the judge went beyond out into the general industry. There are panels that are larger in size than what was present at Cumberland. And I'm not going to, because there isn't anything in the record about how they ventilated those particular panels. What's the normal way in which ... It's not a bleeder system, correct? Well, the bleeder system addresses the air that is coming off of the gob and carrying it away from the active workings and taking it out of the mine. But obviously here, there was ... Under your ventilation plan, you were having a problem because there was a lot of methane in the gob here. It looked as, even to you, or your client, as if early in January, there were problems getting the methane out that you needed to get out in order to avoid an assessment above five. Is that correct? Well, when the wall initially started up, there were certain adjustments that had to be made. This panel did not liberate an unusual amount of methane for Cumberland. What were the measurements that you were getting in January? Prior to the first citation. Prior to the first citation, the measurements at the bleeder evaluation points were within acceptable ranges. There is no set limit, but they were well within acceptable ranges. What were the problems that you were ... Let me try to get to that. Were you getting anything in the high threes, four range? As far as I know, no. Now, having said that, I don't want to mislead you. The primary area you're focused on is the that are running continuously. That is where the mining is going. That is one of the two ways methane is liberated is by the breaking of the coal. That's what you're focusing on. The normal evaluation of a bleeder system goes on, not on that kind of basis, but on a weekly basis. Now, they were monitoring it because when you start up a long wall, you need to proceed initially with care. Weren't you also monitoring it in a special way because you were already in hot water after January? The implication from the record, in fact, is more than an implication, is that you were found to be dealing with a dangerous situation right from the start. You had to have an amended plan right from the start. Part of that amended plan involved specific measurement locations. I've been, frankly, puzzled by the due process argument where you say who knew this was going to be a matter of enforcement when right from the start you knew you had measurement problems or extra gas issues. The plan that apparently you had reached involved establishing these additional measurement points. How is it a surprise to Cumberland that the measurement points established would be used to measure and make decisions about enforcement? Well, the two measurement points that were established on January 21st when the plan imposed so that operations could continue were in a number two entry and by the long wall phase. They were not limits. They were action levels. They said if you reach this level, you are to cease mining and do additional things. That does not provide notice, frankly, that if you do what your plan requires, you are then going to be cited. I think we've got two things happening here. It feels to me like you're conflating two arguments. I thought you had two separate arguments. One was we didn't have notice, so correct me if I'm wrong, we didn't have notice that these measurement points were going to be used in an enforcement way. The second argument being that if we complied with our plan, that necessarily meant we couldn't be found to have a dangerous situation. Am I wrong that those are presented as two separate arguments? They're presented as two separate arguments, but they are related because what MSHUR relied on to cite us on February 4th and February 7th were the methane levels identified in the plan. Let's take them as two separate arguments to start with because that's how they were presented to us. First, sticking with that first argument, not going to the second. If you're in discussions with the Mine Safety Administration, they tell you, look, we're going to be looking at these points and measurements at these points. How are you not on notice that the measurements from those points are going to have some meaning to the government regulatory agency that's looking at them? Well, we are on notice. What they gave us notice of is we're creating an action level after January 21st, and if you reach those action levels, you are to take certain actions, including shutting down production. That's what we're on notice of at that point. So your legal position is that you needed to be told in advance that what all the ramifications or consequences or potential actions the government could take in response to their concern about measurements in order for you to have been sufficiently on notice to be subject to citation. Have I understood you? Well, the fact that they told us that if you do this, you'll be in compliance with your plan, is what they told us. So we're back to your second argument now? Yes, because you can't separate the two in the sense while you try. Obviously, there's a notice issue and there's how the plan interacts with 75334. You can't divorce those. The problem we have from an enforcement standpoint is IMSHA relied on those levels but didn't let us comply with the plan. The assertion is made that you were the subject. Hugh Cumberland was the subject of the principal case interpreting section 75.334. If that's true, this R.A.G. Cumberland resources case that came out in August 2004, since that had just happened or was hitting you at about same time, you were in that case. Again, I ask you, how could you be surprised? Well, that case is not about the internal pathways of the goth. That case is about a bleeder shaft and the amount of methane in the bleeder shaft. So it's the fact that it's a different piece of the mind and not the legal principle it talks about? It's a piece of the mind that IMSHA has never issued enforcement action on what's going on in there. What we have here is in the number two entry, which is part of the goth and as the methane comes off the goth and is diluted and even on January 16th, you can look at what's at the bleeder evaluation point 38, the methane is going down, it is being diluted. IMSHA never prior to this time used what was going on in that number two entry for enforcement action. Excuse me, Eric, I'll put on 15 minutes. Yeah, can I ask a technical question here? Just purely, is it said in by or in be? In by. Okay, the in by and the out by. I'm not exactly clear on the direction. I take it that the, I think the in by is that direction that you're mining toward? It's toward the interior of the mine, yes. Yeah, and out by is that direction the other way? Have I got that right? As I stand here at the podium, in by is toward you, out by is toward the door. Okay, and you want to go out by? I'm just kidding. We want the methane to go out. We want the methane to go out of the mine, yes. It seems, as I look at it, that the January 16th citation is a bit different. You're making a bit different argument as to that one versus the February 4th and February 7th citations. It seems, the way I read it, was that you're following the ventilation plan for January 16th somehow immunized you from being cited because you were supposedly following the plan, although you had made revisions to it. You had notified the government or the commission. But why should your following a ventilation plan that they find doesn't, isn't working, immunize you from a safety citation? Well, January 16th is a little bit different than February 4th. February 4th and 7th, it's very clear. We only have one issue with respect to the plan, and there's no gray area. On January 16th, the initial plan that had been submitted, they had submitted revisions. And because the citation was issued January 13th about the plan, the plan process was renewed on discussions as to what the appropriate plan would be. Then Amesha comes along on January 16th and says, we don't care what discussions we're having with you. We're going to cite you for this. The problem is that 75334B1 is a very general sort of broad statement of purpose, so to speak. And how the devil's in the details and how the details are important. So, I think it's important to invest a lot of time and energy on both sides of the equations, us and Amesha, to work out a plan. Doesn't your argument, though, make 75334 superfluous? If you take your argument to its logical conclusion, isn't it, if we have a plan, there's no such thing as a plan going wrong. The ALJ's assertion was, you make a plan, that's your best estimate. But 75334 is around because a plan is not a guarantee and you have to have some enforcement mechanism to deal with problems that arise. How does the argument you're making meet the point that's made by the ALJ? Well, 334B1 is not superfluous because it tells the developers of the plan, where you're going, what you are trying to achieve.  Without 75334B available as the benchmark in the plan process, you wouldn't know what your plan is intended to do. But doesn't that regulation specifically contemplate enforcement? I mean, it's not there just to say, these are the things we want you to meet in your plan. It's there to say, this is what we'll hit you with if there are problems. Well, actually, it doesn't say that. What it says is, this is, as we see it, it sets out the general principle and how you design, you believe your system is implemented in the plan, but you've got to actually have that general principle there. It's not superfluous. If it wasn't there, you wouldn't know what direction you were headed in your plan. And the thing is, if the plan's not adequate, the solution is what Mr. Swintoski testified to. You tell them to revise the plan. But I think what happened here is, you had the Inspector Penninger come in. Yes. And he found that there were substantial amounts of methane that were too close to the face. That's a quote, too close to the face. That's what he said, yes. On January 16th. Why is that? If safety's our concern, why is that any problem whatsoever? How does that help you say that we can avoid a citation? Clearly, the plan's not working. Well, the methane levels that Mr. Penninger identified were levels that the testimony was. That would not be unexpected coming off the rubble zone, so to speak. Well, instead of getting into the specific fact there, take a hypothetical based on what Judge Ambrose is asking. Assume it was a really bad level of methane right there on the face. And it's close to the face. Well, it's close to the face, but it is moving away from the face. And that's the key. But the ALJ found to the contrary, did he not? He found that it wasn't moving away. It wasn't just the recording. So it's decredited Penninger's findings. I recognize that, but the problem with crediting that, at the end of the wall face, there's what's known as a T-split. A T-split, the air comes across the face and divides there. Some of it goes back into the gob, some of it comes out the return. Air moves because of pressure differentials from high pressure to low pressure. It's easy enough for even me to understand. Because of that, if the air is moving and it is moving with the pressure differentials, while you may have methane at the first crosscut or the second crosscut in by the long wall face, it is not coming back out on the face. Well, let's take a hypothetical. Move away from the facts of this for a second to test your legal position. Assume that there was an unacceptably unsafe level of methane along the face in the mine. Is your legal position that because you had a plan, the Mine Safety and Health Administration was powerless to cite you under 75334 because you had a plan under those circumstances? If we were complying with the plan, yes. And if I may, you described a high level of methane along the face. If there were a high level of methane along the face, that's addressed by different standards. And the level of methane along the face is 1% and you shut down. I'm trying to get away from your technical arguments about this specific mine to ask you about your legal position. I think I have it, which is in the view of Cumberland, it doesn't make any difference what's happening along that face or in that mine so long as you are compliant with the plan you made. And I am mystified by that because doesn't that just tie the hands of the Mine Safety and Health Administration in a way that the regulations couldn't possibly have been intended to do? It does not tie the hands of the Mine Safety and Health Administration. Why is that? They do not have to issue a citation. They can simply say, we want you to change your plan. So, there needs to be a bureaucratic kind of discussion while there's a safety issue? Well, first of all, recognize that this methane we're talking about is not in an area where miners are working and it's not where there are ignition sources. It's away from the face. How do you distinguish the Plateau Mining Company decision? I mean, doesn't it say exactly the opposite of what you're arguing here? The Plateau decision, in fact, said that regardless of what the plan says, they can cite a violation of 75334B1. Plateau is not final yet, though. It is on the field of the 10th Circuit. But if we follow that, if we follow that, then it's obviously your position. Yes, you would reject the argument that I've made. But the problem is that, and it's brought to light best by the February 4th and 7th ones. You've got to do this trouble of putting in a plan, putting in action levels, and then it doesn't matter. Are there better arguments, really, with February 4th and 7th as opposed to January 16th? In terms of the plan, yes. They are much more clear-cut. And isn't your problem with the February 4th and 7th citations that, I guess, where do you take the measurement? If you take it at the gob, I guess your argument is that you're always going to come up with a high methane level. There are... Boiler systems are a process of managing the methane that you are producing. Yes, you are going to have methane moving through the system. It is not going to be diluted within the worked-out area of the rubble zone. It's going to be diluted on the fringes because that's where air can move. That's where you're going to have methane transitioning down to levels below the lower explosive limit. But you will have higher levels of methane until that occurs. What we are saying is... What were some of the measurements you had in early February then? In early February... Did you have anything that was over the limit? Well, there were... Over the threshold, I'm sorry. There were two... On both those days, they were over the action level at the measurement points within the number two entry. However, when it got to the Boiler evaluation points, it was diluted down below acceptable. It was in an acceptable range at that point. So, what happened is exactly what we were saying. It was on February 4th and 7th. In the number two entry, in the GOB area, you've got higher levels of methane. As the air moves it and as it mixes with the air, it dilutes down and it comes out at the Boiler evaluation points, which are the points where you're supposed to evaluate it within an acceptable range. And you're saying where the GOB is, there are no humans there? People do not normally travel in a GOB now. It's an unusual situation if you can go into this number two entry safely. And that's because of route for issues. It doesn't have anything to do with methane. Are you saying that a citation can issue solely because of the methane reading, or can it also issue because of a combination of factors? If the inspector feels that the airflow is not sufficient because of the way the thing is set up? If you do a full evaluation, which you should do, it shouldn't be just based on methane levels. You should see what's happening, which the inspector really didn't do on February 4th and 7th. Then, yeah, what you're looking at is 75334B1 doesn't talk about methane levels. It talks about how it functions. It moves air away from the active workings, dilutes it down until it gets into the boulevards, and there's only one methane limit in the boulevards. That entry has established, and that's a distance away from the air where the air enters the boulevards at the boulevard evaluation points. Let me ask you, if I may, about what the commission did here. There seemed to be an agreement, although there was an even split on the commission as to the two February citations. Both of those groups of commissioners seemed to agree that the ALJ had not gone ahead and laid out an analysis of the evidence underlying the citation. Am I right about that? He hadn't gone and put out an analysis on the February 4th and 7th citation. That's what I'm saying. So if they were all agreed that that was the case, how is it that they could properly have started talking about the evidence themselves and come into conclusions? I'm not sure I can answer that, Your Honor. That's what they did. The judge discussed February 4th and 7th citations in a paragraph, and then all four commissioners went ahead and discussed the evidence, regardless of whether or not he had set out his basis. Commissioner Young felt there was enough basis. I can't remember what Commissioner Jordan did on that, but I know that commissioners Duffy and Sobolewski said it wasn't an adequate basis, but then went and discussed the evidence as to why they thought he was wrong. Good. We'll have you back on rebuttal, Mr. Moore. Thank you very much. Thank you very, very much. Just a moment. Good morning. Good morning. I would like to just address a few things that Mr. Moore spoke about when he was up here. He explained that what's of concern here at the mine would be the methane on the face and that basically sensors on the face would alert you as to whether there was a problem with explosive levels of methane. And there is significant testimony that that's actually not the case, that higher explosive levels of methane that would be in that number two entry could reach the face and explode on the face where the miners are working, and those sensors would not detect that methane. Coming from where? Coming from the gob area. So, in this case, on the 16th, there is a lot of evidence from the ventilation survey that the methane was in fact moving toward the face, and it was a distinct possibility that that methane could explode where the miners are working and where there are many emission sources. He also spoke about methane levels in general in the gob and said that you would expect those accumulations to occur. And there is testimony from EMSHA experts, one who's been involved in 50 ventilation surveys at dangerous mines, that you would not expect higher levels of methane and flowing air flows within the gob. The purpose is to dilute the methane in the gob. You wouldn't just allow it to build up. Did he say where do you measure it? In this case, the measuring points that existed to measure the gob were at the most in-by point, the bleeder evaluation point 30, and EMSHA determined that actually that evaluation point was not measuring the conditions in the gob. What it was measuring instead was fresh air basically coming up the ladders, and so you could not tell anything about the gob. And that's why they insisted that Cumberland put in these evaluation points at these two different cross-cuts in the gob, because there was no way to actually measure what was going on in the gob. What's the response to the assertion from Cumberland that this is an unprecedented step by the commission to take readings effectively from the gob and make conclusions about it and issue citations on that basis? I think that it's actually not unprecedented, because you usually would be monitoring conditions in the gob. The dissenters seemed to think it was pretty unusual, didn't they? Excuse me? The dissenters on the commission? The dissenters for the February 4 and 7 citation. I think maybe they were disturbed by the fact that it was put in this number two entry, and maybe they disputed the idea that the bleeder evaluation point at the most in-by part was not in fact measuring what was going on in the gob. But that's why EMSHA insisted on those two points, because the conditions in the gob were not, you could not measure them. You don't think it's because the dissenters thought this is unusual? There's a point, it's in the appendix of 25, where they actually say they think the AOJ failed to, quote, fully comprehend the critical fact that the high methane readings on February 4 and 7 took place not in a travelable bleeder entry or the designated BEP, but in the gob, an area in which the presence of explosive methane mixtures was not unexpected or contrary to any regulation. That's the assertion of the two commissioners in dissent. Are they just wrong about that? Our position is that it is in fact contrary to the regulation. The regulation requires that the mine operator control the levels of methane in the system, and you are not controlling levels of methane if you're allowing them to accumulate in the gob at explosive levels. But in the gob, they automatically are high, are they not? They may be. The idea is to take the concentration in the gob and disperse it out, is it not? You should be able to dilute the methane levels actually in the gob. You may find levels of methane in crevices or between the rocks in the gob and the fallen rocks, but you would not find them in a flowing airflow in the gob or in this number two entry, which is part of the gob, but is an internal airflow path in the gob. That is MSHA's position. Let me ask you about your briefing on page 45. I think it's note 15 of your briefing. You talk about the established, quote, the establishment of measuring points in the number two entry, close quote, as, quote, unprecedented, close quote. Now, do you mean by unprecedented in the history of MSHA regulation, or do you mean unprecedented in connection with this particular mine? I believe that in this particular mine, the conditions in the number two entry have not been measured before. There is testimony from MSHA inspectors that they have put monitoring points in places that were not bleeder evaluation points initially in other mines. Basically, what their testimony was that wherever we feel like we need to measure conditions in the gob, we will put an evaluation point. Just to make it simple, is there precedent that MSHA has for measuring methane levels in the gob in connection with citations that are being given? Yes, you would usually measure levels of methane in the gob at the evaluation points, which is what they measure in every plan. In this case, they had to move the evaluation points because it wasn't effectively measuring what was going on in the gob. So why wasn't it effectively measured? Because the air was moving toward the face, and it wasn't moving toward the back. The evaluation point is at the back of the mine, and so as the air is being diluted, it's supposed to pick up what's going on in the gob as moving that way, and then it moves into the bleeder entry and out of the mine.  It was just basically sitting in the air pathways and could have gone either way. There's smoke tube reading showing that. I mean, they put up the smoke, and it could go to the back of the mine. It could go to the front of the mine. So that's why it wasn't picking up those measurements. So it's relevant if there's a buildup there because it could move. If it were to move rapidly, it could be dangerous. Yeah, it could move. Or if it stays static, it could be dangerous, couldn't it? Yeah, you could get an explosion in the gob itself. If it stayed stagnant there and continued to build, and it could also move toward the face and explode right on the face. Either way, miners are working adjacent to the gob. There's not some big separation. Anything that goes on in the gob is going to blow right toward the miners. And so that's an important piece here to understand. Well, again, I'm not sure we've quite nailed down this difference of opinion. Cumberland says that, are they saying that you haven't measured in the gob in the past, or you simply haven't relied on gob measurements and citations? I guess it's the latter, and you dispute that. Right. No, we have relied on measurements of, I think plateau, that is the issue in that case, is a measurement in the gob. Let me, if I could, turn your attention to the February 4 and 7 citations and the assertion that the dissenters make that the ALJ simply didn't address the due process arguments that Cumberland had made in that respect at all, and then also that there was not a discussion of evidence as to the February citations. First, let me ask you if you agree with that perspective, that the dissenter's perspective on what the ALJ did or failed to do. I believe that the ALJ did not go into as extensive a discussion of the citations as he did on the January 16 citation, but I believe that he did discuss those citations in the context of what had happened on January 16. The way I believe that you should look at the February 4 and 7 citations is in the context of everything else that went on before and what was known about the system to that point. Didn't basically the whole commission at least agree on this with regard to February 4 and 7, that the ALJ hadn't discussed the evidence? I am not sure that that was the position. I know Commissioner Young issued this. Commissioner Young and the two dissenters did. I'm not sure how Commissioner Jordan dealt with it, except he seemed to be tagging along a lot, and I don't mean that in a negative way, but with Commissioner Young's holdings. At a minimum, you got three out of four of the commissioners saying the ALJ just didn't talk about the evidence with respect to February 4 and 7. If that's accurate, what are we to do? I believe that Commissioner Young discussed the ALJ's decision, but he also looked at other evidence that the ALJ did not cite, which was specifically the testimony, and I believe this is something you could rely on, the testimony of MSHA's expert witness. How could he properly do that? I mean, they're a reviewing body, right? Not a fact-finding body. We're a reviewing body, not a fact-finding body. So if there are any factual issues, to the extent the commission started finding facts, isn't that problematic? I think that the evidence that the commission discussed with regard to the ALJ's decision was not as extensive, but I do think they had enough facts to make a decision about whether there was a violation on February 4th and 7th. The test is whether substantial evidence is supported, but obviously there were some concerns that some of the commissioners had. I'm sorry. Let me give you one example. There's a statement by Commissioner Young that the January 21 revision of the ventilation plan includes some monitoring at crosscut 85, I think in the number 2 tailgate area entry, and the dissent looks at that and they say that that plan only called for pipes to be used, and they're talking about monitoring for safety purposes. So on the one hand, you've got some implication at least that there was a safety issue there, and that's why there was monitoring, and you've got the dissent saying there's nothing in the record to show that there was a safety concern there. How can a reviewing body in the first instance address what appears to be perhaps a competing argument about what the record shows? I believe that that plan on January 21st, those monitoring points were put there for safety. I mean, there'd be no other reason to create a plan to create monitoring points, but for safety. So I'm not sure why the dissent would have said that those monitoring points are unrelated to safety, because that's the whole purpose of creating the plan. The purpose of the plan is to mine the coal safely. As Mr. Moore said, he believes that you should just rely solely on the plan and comply only with the plan, but that is the only reason why you would have monitoring points, and those were specifically put there for that purpose. But part of the problem that I think Cumberland's making is, look, they may have been on notice that the plan was having, was not working as well as they had hoped in December, but they were not on notice as to what the criteria that you would use in order to cite them on January 16th. I think that Cumberland had significant notice of what was happening at the mine. I think in addition to... No, they had notice of what they were finding, but what notice that they had as to how you were going to view the, what criteria you were going to use in order to, in the end, cite them on January 16th. Well, Cumberland itself, in terms of conditions in the number two entry, Cumberland itself was in that number two entry in the same spot where MSHA was doing the measuring on January 11th, because they were concerned about conditions in that area. Also, on January 13th, when MSHA first showed up at the mine, they were also in that entry. Everyone was aware that that entry was open and that you could walk through there and measure conditions there, so that it would not have been a surprise to expect that MSHA would come and do, conduct a survey of an entire system. This ventilation survey was extensive, had seven teams, I think, going through the mine, taking all sorts of measurements, and so you would assume when you would have a survey like that, that you would look at every place in the mine. And what about February 4th and 7th? Did they know what criteria you were going to use under 75334? I think that's even more clear in that case, because already that January 21st plan had been put into place, and that included those monitoring points. So Cumberland should have known that MSHA would be looking specifically at those monitoring points, which, at that point, MSHA believed that those were the only places to measure the gob, because, as I explained before, the actual evaluation point at the end of the gob was not measuring anything.  Does MSHA ever direct, or require, or encourage the installation of ventilation points for purposes other than for monitoring? In other words, is it possible that, first in the abstract, and then in this case specifically, that MSHA would say, look, we want pipes installed there. We're not going to be monitoring, we just want some ventilation there. Does that ever happen? No, I don't personally know of that, because I don't see any reason to do that. I think the pipes were put in, and are put in, to make sure the conditions are safe, and that ventilation is actually occurring, and that the methane air is being moved away from the patient in terms of working. So you could have a safety issue, I guess what I'm asking is, you're saying that any vent point is, by definition, and everybody knows it, a monitoring point? The bleeder evaluation points you're talking about in the plans? No, I was thinking specifically of this crosscut 85 and number 2, where, again, the descent seemed to say, in a footnote, look, they told them to put pipes in, but, in effect, they didn't tell them, you're going to be monitored and hit because of this. Now, I hear your argument being that that's not a credible thing to say, because every point is an evaluation and a safety point. I'm just trying to find out factually whether there's ever a point that's used for venting that's not used for evaluation, and whether that is, indeed, a good distinction that the descent seems to be making. From my limited experience with these mine cases, and I really only have experience with this one, I believe that the plans are created with monitoring points for the purposes of safety and monitoring the conditions in the gob, and you would not have just other points randomly placed. Put on 15 minutes, please, Eric. And with respect to the February 4th and 7th citations, is it correct that the ventilation plan had specified those particular points at the number 2 entry, so that it's difficult for them to say that they weren't on notice, that they would be measured at that point? Is that correct? Yes, that is correct. Okay, but for the January situation, it's a bit different, is it not? It's different in the sense that those points were not contained in a plan at that time, but it's not different in the sense that Cumberland was aware that there were problems in that entry at that time. And it's your position that you can use methods or means of measurement or evaluation other than what is laid out in the ventilation plan to find out whether or not there's a violation? Yes. I think the condition here is the safety, I mean, the focus here is the safety of the miners, and so when you're conducting a ventilation survey, you're going throughout the mine to, you're going throughout the ventilation system to figure out what the problems are. So the purpose of the ventilation plan is to, as Mr. Moore said, it's worked out between the agency and the operator to make sure that, so both sides are trying to make sure that it's going to work properly, but your enforcement authority is not limited to what's in the plan, is that, that's your position? Yes, that is our position. Let me ask, even if this is indelicate, what's the, what is really at stake in this appeal? Because it seems like, as a practical matter, long since Cumberland has changed from this wraparound system to a more traditional kind of system for a mine face of this size, and that there are problems that led to the citations have abated, and that the citations themselves are not of a tremendously large monetary value relative to what, you know, typically happens in a big business enterprise. So what's going on here, in your understanding? What's at stake that's leading to litigation on this scale? Well, that might be a good question for Mr. Moore, but I think that in this case, it's our interpretation of the standard, MSHA's interpretation of the standard, and this is a safety-promoting interpretation of a standard that is broad but cannot be made any more specific, and in this case, there are, it's not very, it's not unclear, and in the context of this mine, it would have been known that there was no dilution, movement, and control of the methane air that is required by the standard, and so that is our... But part of the problem is, and the dissent brings this out, is that if you're going to do a citation, this is for February 4 and 7, you have to do it in a way that everybody understands what the game is, and they allege, Duffy and the Sobolewski, whoever, the person that joined with him, that you were setting unprecedented measuring points for the methane levels. Right, and I think... And that's why I went back and was asking you about what you were saying in your brief, because if it is unprecedented, it means the other side didn't necessarily, didn't know about it, and then there is really a question of fairness here. Well, they did know about it in the sense that it was in their ventilation plan. But was this, were these unprecedented, and I think the language is unprecedented... MSHA's citations were based on an unprecedented theory of measuring methane levels within the GOP itself to allege that a ventilation system was not functioning effectively. It is not unprecedented that MSHA looks at levels of methane in the GOP to determine whether the ventilation system is working effectively. I think Commissioners Duffy and Sobolewski were looking at the citation as one point in time, and that our position is that even if it was one point in time, it would still be a violation of the standard here. But in this case, it's not one point in time. It's what occurred starting when they initiated the plan and chose to use this wraparound system instead of the leader fan shaft in December 9th, and then all of the subsequent events to those dates on February 4th and February 7th, which included knowing that the airflow was going in the wrong direction, knowing that methane was accumulating in explosive and near-explosive levels, and many, many meetings between Cumberland and MSHA where MSHA continued to say that this was an inadequate system, it was not adequate for normal mining, and it was still fragile. So that is the context in which those citations were issued. And the inspector who issued the citations was very aware of the context. And so it is not one moment in time that MSHA was looking at here. So I think that's an important thing to keep in mind when you're looking at what Commissioner Steffen and Sotolowski said. Then what is the argument as to unprecedented? What was unprecedented? What is unprecedented, I think, is not using the leader evaluation point at the in-by portion of the GOG. I think, I believe that that probably was unprecedented, but it was necessary here because those leader evaluation points weren't reflecting what was going on in the GOG. And so you could say, you could tell MSHA, well, why don't you only use the leader evaluation points, but that gets back to the same argument of, you know, whether the only requirement is that you comply with the plan. And it is not. The requirement is that you comply with that standard. But you can understand what their problem is. There is a plan in place. Everybody had agreed to it. And they're saying, you know, we're abiding by what you told us to do. You know, we're describing our own set of problems. We call you in, you know, we don't want an explosion. And then what you do, instead of coming in and working with us, you cite us. Well, I think that MSHA was working with Cumberland at this point. I mean, they had worked with them at this point to keep the mine operating, more or less, and trying to create small improvements. But what happened was, by the end, at this February 4th and 7th point, any of the improvements that had been made hadn't changed the dilution capacity in the mine. All it had done was redistribute the air. There's a lot of testimony about that. And so, at that point, it just, there was no more air to push through the system. And the dog was getting bigger and the mining was continuing. And so, that was kind of the situation on those days. Do you have anything else, Ms. Pullman? Anything else you want to tell us? No, I don't think so. Good. Thank you very much. Mr. Moore. Thank you. Several points. One is, just so we're clear, monitoring points. And there was a monitoring point other than BEP-30. That's the one at the back. It was 30A where the air was also going. And that gives you a monitoring point. The second is, a monitoring point isn't necessarily to say there's a safety issue right now. Why assume that when MSHA established its action levels, for example, in the January 21st plan, that they left themselves a margin call out of safety to, in which case, so that there wouldn't be an issue, a safety issue. Do you agree with Ms. Bowman, though, that anytime MSHA says, we want you to put a pipe in here, it's understood that that's going to be monitored. It's not just a vent point for vent's sake. It's to be monitored, and it could be a monitoring point that leads to enforcement. No, actually, in this case, what they did is they told us to put those monitoring points in and take certain action if the levels came to certain, the action levels. They didn't say we were going to take enforcement action. I'm not getting an answer to my question, though. Maybe it's because it's calmed down. Let me try it again. I asked Ms. Bowman a couple times, is there ever a vent point required by MSHA which is not a monitoring point, a safety monitoring point? She said no. It's the only reason you'd ever do it. Do you agree or disagree with that? I agree with that. All right. And do you agree or disagree with the subsequent, at least implicit, assertion that if it's a monitoring point, it is per force a potential point from which MSHA might take enforcement action if they don't like what the monitoring shows? I would disagree with that, yes. So you could have monitoring that could never be a source for enforcement? Well, you could have monitoring that is not a source of enforcement action, but is a source of information for you to evaluate. Okay. That's what you're doing. The only limit in the bleeders is not anywhere close to these monitoring points. What's really at stake here, if I can ask that? The question I asked Ms. Bowman. What's really at stake are several things, Your Honor. The first of which is this use of levels, pressure, differentials, and the like within the GOB for enforcement action. That's number one. Number two, the inability to rely on a ventilation plan and rather than be confronted by enforcement actions is probably the second primary driving point here. Okay. As to the first point, the government's assertion, you've heard Ms. Bowman repeat it here, is that that needed to be done because the monitoring points that had been set up, just, they weren't functioning. So you needed to do something to measure safety, and if the monitoring points weren't effectively reflecting what was going on, you had to find another way to monitor. Assume for the sake of discussion that that's true. So as a legal matter, are you saying MSHA can't take measurements, even if unprecedented in the way they're doing it, in order to effectuate the safety purposes they have? The way you phrase it, obviously, we'll have what happened here, which is MSHA took the action. They imposed the requirements. Right, which is why I'm asking it the way I am, because I want the legal answer, not the factual one. But we need to back up for a second, because there was a misstatement here that the BEPs weren't providing sufficient information. Before January 16th, they have an argument along those lines, though we think that we'll disagree with. But after January 16th, before January 16th, the argument was that fresh air from the ladders was coming through BEP-30, and that's what all that was going through that BEP. I understand you disagree with that factually. Can I ask a follow-up here? I understand your factual argument. I'm asking you a legal argument. Assume that they were right, that they weren't getting proper monitoring there. Is your legal position that, still under those circumstances, MSHA could not properly say, look, measure this way, even though it's unusual, never been done before, because we have to do some kind of measuring, and these points aren't working? In a context of a long-law breeder system, to establish measurement points within the gob is not giving you any more accurate information, because what you're doing is you're trying to break, step into the middle of a process. What you're interested in is the process, not where you are in the process in the gob. So you're saying that no measurement in the gob is legally relevant? Is that where we end up? Well, I wouldn't call it legally relevant. No measurement in the gob is an effective evaluation of a breeder system. That would lead to a possible enforcement action. That's what I meant by legally irrelevant. I will draw a comparison. When you are mining coal at a face, you measure the methane with respect to that face, not up against the face, but 12 inches away, because when it's coming out of the coal, it's 100% methane. What you want is a distance away from there. What we're saying, the same thing here, you want a distance away from the gob, so that you can actually let the process that you put in place, the ventilation process, work, rather than measuring in some interim step that doesn't actually give you information that is going to tell you whether or not that system is working. Weren't the MSHEF inspectors concerned? We keep talking about methane, but were they really concerned about the safety issue of volatility of the ventilation system? There appear to be jumps in readings. They have a right to be concerned about volatility, do they not? The inspector in February was concerned about the rise in methane levels, but that's where he stopped. He didn't. He wrote the citations and the imminent danger orders and left. I'm sorry, I didn't hear that. He wrote the citations and the imminent danger orders, the commission vacated and left. If there's a rise in methane, which the dissenting commissioner said, you know, you sometimes get transitory rises in methane, then that doesn't mean your system's not working. It simply means that you have an issue you may want to address. The same thing applies. I'll go back to, forget about long walls for a moment, to other types of sections. You have methane action levels where you may reach a certain level, one percent, and you shut down. That doesn't mean your ventilation system is bad or anything like that. You have had a transitory rise in methane. That you need to wait until it dissipates. Good. Any other questions? Uh, Mr. Moore, thank you very much. Both counsel made excellent argument here today. We'd like a transcript made of this argument and for both sides to share the costs of that. If you would kindly check with the clerk's office as you leave, I'll tell you how to do that. Take the case under advisement. We thank counsel very much. Good. Tamayo versus Attorney General.